(36 Misc. Rep. 649.)

## PLANT v. HARRISON et al.

(Supreme Court, Special Term, New York County. January, 1902.)

1. DOMICILE—WHAT CONSTITUTES.

The permanent home and principal establishment of a person, to which he intends to return when he is absent, is his domicile.

2. SAME—CHANGE—EVIDENCE.

To effect a change of domicile for the purposes of succession, there must be evidence not only of a change of residence, but of an intent to abandon the former domicile other than the mere declarations as to such intent.

3. SAME.

A resident of the city of New York, who was domiciled there for 19 years and up to within 6 days of his death, was engaged up to such time on a plan to centralize all his property in a Connecticut corporation bearing his name, and while in such state, three days before his death in New York, made arrangements to board in such state at some future time, and examined a house in such state with a view to purchase. *Held* insufficient to show a change of domicile.

4. SAME.

A person's declarations, whether in writing or oral, as to his intent to change his domicile, are not to be considered when they conflict with his acts.

5. SAME.

Where a person returns to his domicile after a visit of one day to his alleged new domicile, and there is no evidence of a present intention of remaining permanently in such new domicile, or that he ever left his old domicile without an intent to return thereto, the evidence was insufficient to show a change.

6. WILL—ACTION TO ESTABLISH—ESTOPPEL.

A legatee sued to establish a will and its codicils in New York on the ground that they were in Connecticut, and could not be obtained for probate in the proper surrogate's court in New York, and also alleged that a codicil executed in Connecticut three days before testator's death, describing him as a resident of Connecticut, was made to evade the laws of New York, because the will of testator suspended the power of alienation, contrary to the laws of New York, in which state the majority of the property of testator was situated. *Held*, that the action was not barred because said legatee on her own petition had procured the will to be probated in Connecticut in a court having jurisdiction, and had obtained a decree, unappealed from, declaring that the testator was at the time of his death a resident of Connecticut.

7. PROBATE OF WILL—COLLATERAL ATTACK.

A decree of a probate court in Connecticut after proof as to the question of residence may be collaterally attacked as to the recital therein as to the residence of the testator under the decisions of the courts of Connecticut, and a legatee thereunder may prove, in an action to

probate the will in the state of New York, that the domicile and residence of the testator at the time of his death were in the state of New York.

**8. SAME—CONSTITUTIONAL LAW.**

Const. U. S. art. 4, § 1, requiring each state to give full faith and credit to the judicial proceedings of every other state, does not prevent collateral attack in one state of a decree of a probate court of another state, holding that a testator of a will probated by it was a resident of such state.

Action by Margaret J. Plant, individually and as trustee under the will of Henry B. Plant, against Lynde Harrison and others, to establish a will. Judgment for plaintiff.

See 65 N. Y. Supp. 236.

Guthrie, Cravath & Henderson (John E. Parsons, of counsel), for plaintiff.

Carter & Ledyard (Maxwell Evarts, of counsel), for defendants.

LEVENTRITT, J. The primary object of this action is the establishment of the will and codicils of the late Henry Bradley Plant as the will of a resident of the county of New York. The plaintiff is his widow, while the defendants, with the exception of the infant defendant, are executors and trustees under his will. A résumé of the material allegations of the complaint shows the following state of facts:

Henry Bradley Plant died on the 23d day of June, 1899, in the eightieth year of his age, at the city of New York. For the preceding 25 years he had been continuously domiciled in the county of New York, having his permanent home at No. 586 Fifth avenue, where he died; while his permanent office for the transaction of business was at No. 12 West Twenty-Third street, in that city. He left, him surviving, his widow, the plaintiff, and an only son, the defendant Morton Freeman Plant, the issue of whose marriage is a son about four years of age, named after the testator, and who is the infant defendant in this action. He left a last testament, consisting of a will, dated January 23, 1893, and three codicils, dated respectively November 22, 1894, May 25, 1899, and June 20, 1899. The will and the first two codicils were severally executed at the city of New York, while the last codicil was executed at the city of New Haven, in the state of Connecticut. The complaint thereupon alleges that by the execution of the New Haven codicil it was his object to circumvent and evade the laws and policy of the state of New York, and to suspend the absolute ownership of personal property and the absolute power of alienation of real estate for a longer period than permitted by the laws of this state, and that the declaration in the codicil that he was a resident of New Haven was made for the purpose of carrying out such object, when in fact he was not then, nor at the time of his death, a resident of Connecticut; that at the time of his death he was not seised of any real property either in New York or in Connecticut, but was possessed of over ten millions of dollars of personal property (at the time of the trial its value had doubled), consisting mostly of stocks and bonds of various corporations; that the physical location

of the major part of this property was in New York at the time of his death, and that a part still remained there. By reference to the will and codicils the complaint then shows that the plaintiff is a legatee having no interest beyond an annuity of $30,000; that the defendant Morton F. Plant has a like interest; that the residuary estate is to be held in trust during the lives of the widow, the son, and the grandson; that the trust terminates on the death of the grandson, providing the latter's youngest child is then 21 years of age; and that otherwise it continues until the youngest child of the grandson arrives at that age, when it is to be divided according to the provisions made in the will. The complaint further alleges that the original will and codicils are in Connecticut under such circumstances that they cannot be obtained for the purposes of probate here; that at the time of Mr. Plant's death they were in a sealed envelope at his home in this city, in the custody and possession of the plaintiff; that on the following day the defendants Harrison and Erwin, who had long been the confidential legal advisers of her husband, and the defendant Tilley, under representations that it was necessary for the protection of the estate as well as of her own interests, procured the envelope from her, and without her consent took it to Connecticut, where they subsequently filed the will and codicils in the probate court for the district of New Haven. Then follow allegations of her ignorance of the legal effects of her acts, and that she was unrepresented by counsel; then an allegation that there was a hasty removal by the defendants named of the bulk of the personal estate from New York to Connecticut; and the complaint then proceeds to enumerate the steps attending the New Haven probate, which may be briefly summarized as follows: On the day after the funeral of Mr. Plant, which took place in his native town of Branford, in the state of Connecticut, the plaintiff, pursuant to the request of the defendant Harrison, called at his office in New Haven, where he and the defendant Erwin advised and urged her to sign a petition to the probate court for the district of New Haven, being informed by them that immediate action was necessary in order to protect her own interests as well as those of the estate. The petition described Mr. Plant as having last dwelt in the town of New Haven. In response to the plaintiff's statement that this must be incorrect she was informed by the defendant Harrison, in the presence of other defendants, that he had recently, on the occasion of Mr. Plant's last visit,—being the date of the execution of the last codicil,—had Mr. Plant made a legal resident of New Haven. Relying upon the assurance of the defendants Harrison and Erwin that it was proper and to her interest, she signed the petition. The same day the petition was presented to the probate court, and the following day the will was admitted as the will of a resident of the district of New Haven. The complaint further alleges that the probate court did not then have jurisdiction, because the decedent at the time of his death was a resident of the state of New York. The final allegations of the pleading concern themselves with the laws of Connecticut and New York as affecting the plaintiff's rights in the premises.

The answer, after raising certain jurisdictional objections, alleges that Mr. Plant died a resident of Connecticut; that his will was properly probated there; that all the steps attending the removal of the will and the subsequent probate proceedings were had with the full knowledge, consent, and approbation of the plaintiff, who was a willing party to the Connecticut probate. All the allegations of the complaint inconsistent with these averments are denied, and there are specific denials of all allegations imputing to the defendants, or any of them, improper conduct or ulterior motives.

On the issues thus raised a very extended trial has been had before me. Barring the expert evidence on the status of the law of Connecticut, the voluminous testimony was confined mainly to two underlying questions of fact. The first and fundamental one was the issue of domicile. Of what jurisdiction did Mr. Plant die a resident? The second was the question of the alleged fraud on Mrs. Plant and on the Connecticut probate court in the proceedings involving the admission of Mr. Plant's will to probate in the district of New Haven. After a somewhat extended examination of this latter question I have decided not to state my conclusions thereon,— First, because it becomes immaterial in the view I take of the case; secondly, because there is doubt whether fraud is adequately pleaded (Plant v. Harrison, 52 App. Div. 434, 65 N. Y. Supp. 234); and, thirdly, because of the graver doubt whether, under the decisions of the federal courts controlling in this instance because a constitutional question is involved, the judgment of a court of a sister state may be impeached for fraud (Christmas v. Russell, 5 Wall. 290, 18 L. Ed. 475; Simmons v. Saul, 138 U. S. 439, 11 Sup. Ct. 369, 34 L. Ed. 1054; Garrett v. Boeing, 15 C. C. A. 209, 68 Fed. 51; Hanley v. Donoghue, 116 U. S. 1, 4, 6 Sup. Ct. 242, 29 L. Ed. 535). I address myself then to the question of domicile.

I do not deem it necessary to preface the discussion of the facts with any lengthy statement of principles of law. Domicile is so essentially a question depending upon the minute facts and circumstances of each particular case that precedents, with necessarily varying facts, are of slight assistance. A fact of controlling importance in one case is more than likely to have but slight significance in relation to all the facts of some other case. Definitions of domicile are themselves unsatisfactory. That given by Judge Story in his Conflict of Laws ([8th Ed.] p. 41), to the effect that "in a strict legal sense that is properly the domicile of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning," is perhaps as good as any, and may be applied to this case. Beyond this a brief extract from the leading case in this state, Dupuy v. Wurtz, 53 N. Y. 556, will give a succinct statement of the fundamental principles according to which questions of domicile, like the one under consideration, must be tested:

"To effect a change of domicile for the purpose of succession, there must be not only a change of residence, but an intention to abandon the former domicile and acquire another as the sole domicile. There must be both residence in the alleged adopted domicile and intention to adopt such place of residence as the sole domicile. Residence alone has no effect per se,

though it may be most important as a ground from which to infer intention. Length of residence will not alone effect the change; intention alone will not do it; but the two taken together do constitute change of domicile,"— at page 561.

A domicile of choice being gained animo et facto can be relinquished only in the same manner. Udny v. Udny, L. R. 1 H. L. Sc. 441. But both the animus et factum must be expressive of the present intention to reside presently and permanently in the domicile. Personal presence, coupled with the intention to begin in futuro a residence of however permanent character, is not sufficient. Jac. Dom. § 177. Abandonment in fact of the old domicile, residence in the new locality, and the intention to remain there are the essential requisites. The length of the residence in the new domicile is quite immaterial so long as the intention is bona fide, and is consummated by an adequate act. It is well, perhaps, to bear in mind, in considering the facts of the case at bar, that, while a domicile of origin reverts easily upon relinquishment of a domicile of choice, the American decisions have not gone the length of the English authorities in the application of this principle. The English rule that the domicile of origin reverts at once upon the abandonment of the domicile of choice (Udny v. Udny, supra) has not been followed in this country, where the rule seems to be that a domicile once acquired continues not only until it is abandoned, but until another is acquired. Jac. Dom. § 114. Bearing these general principles in mind, let us now search the facts.

Henry Bradley Plant, the testator, was born at Branford, in the state of Connecticut, on the 27th day of October, 1819. His ancestors on both sides of the line were of old Connecticut stock, and on the paternal side had been residents of Branford almost from its earliest settlement. His father died when he was still very young, and, his mother having remarried, he was taken by her to Martinsburg, N. Y., the home of his stepfather, and thence, after a short time, to New Haven, Conn., where she acquired a permanent residence. It appears that his boyhood was spent between his mother's home at New Haven and his grandmother's place at Branford. In 1837, when he became a deck hand on a line of boats plying between New Haven and New York, he began his varied and successful business career, the requirements of which seem to have exercised a determining influence on his successive places of domicile, even to the attempted return to New Haven in his old age. In 1840 he became a registered elector or voter of the town of New Haven, and two years later married his first wife at Branford. Shortly thereafter he engaged in the express business in connection with the steamboat line on which he had been employed, and that gradually grew to such proportions that his presence was more and more required in New York. From the lists of registered electors of the city of New York, and from the statements made by his biographer and by his son, the inference is fair that he acquired a residence in the city of New York, probably in Spring street, some time between 1846 and 1854. In the latter year he removed to Augusta, Ga. Here he resided, and just prior to the beginning of the Civil War organized the

Southern Express Company.  His first wife died in Augusta in 1861.
She was first buried there, but years later—that is, 1896—her body
was disinterred, and placed in a family vault at Branford.  In 1869
Mr. Plant left Augusta and returned to New York.  From that time,
and continuously for 30 years thereafter, he was a domiciled resident
of this city and county, and it is beyond dispute that such was the
legal effect of his living in New York until six days before his death.
In 1873 he married the plaintiff in this city, in the same year pur-
chased the house No. 586 Fifth avenue, and it was here that he died
on the 23d day of June, 1899.  Although early in his married life
he conveyed this house to his wife, and it has since remained in her
name, yet throughout this period it was their joint home; his ac-
knowledged and only domicile for the quarter century of their har-
monious and affectionate married life.  Down to the time of his
death all his personal effects remained there.  There was no change,
nor even the slightest indication of contemplated change, of anything
affecting the interior arrangement of the house or its contents.  The
servants, who had been in his employ for years, were of his house-
hold at the time of his demise.  To the last day he continued to pay
all running expenses; and, in a word, the accustomed routine of his
home life remained as it had been for years before, undisturbed by
anything that may have transpired outside.  The practical centraliza-
tion of his vast business interests in this city furnishes another group
of facts showing how firmly he was rooted here, and it is this substan-
tial and permanent character of his conceded domicile for a long
period of years which materially colors the facts invoked to establish
his alleged subsequent change of domicile.  Mr. Plant's original
occupation as an expressman over a limited area gradually extended
over many states.  He acquired railroad and steamship properties in
many parts of the Union, but chiefly in the South; and, finally, after
hotel properties had been added to the list, the diversified interests
became known as the "Plant System," of which the primary express
business was but a minor component.  While none of the corpora-
tions with which he was identified had a New York charter, all but
the earliest being organized under Connecticut laws, yet the active,
practical, business, and financial management was, until his death,
conducted from 12 West Twenty-Third street, in this city.  Only the
annual meetings were, as required by law, held in Connecticut; and
those in the office of the chief legal adviser, where many other cor-
porations in which he was no wise interested likewise complied with
the statutory formality.  Large business offices and an extensive
clerical force were maintained in this city.  Here, under Mr. Plant's
personal supervision, all authority emanated and all interests con-
verged.  On the day before his death Mr. Plant attended at his office
during the customary hours, and presided over his business that had
gone on uninterrupted as theretofore.  The probative value of these
facts of his domestic and business life is re-enforced by those of his
communal relation.  Mr. Plant regularly exercised his suffrage rights
in this city, and from 1880 to 1899, both years inclusive, was regularly
taxed on personal property as a resident.  Besides, his social life was

centered here. He was a club member, and New York was the domicile of the family of his only son.

On this statement of facts there would seem to be a very complete identity between legal residence or domicile and physical residence. In fact, so firmly rooted does his domicile in New York appear, that only the clearest evidence of a consummated intention could avail to establish domicile elsewhere. We have now to consider the facts relied on to effect this change. Mr. Plant died on June 23, 1899. It was conceded on the trial—what could not be substantially disputed—that up to June 17th of that year he was domiciled in New York. The defendant Harrison, the attorney who guided his footsteps in the avowed attempt to establish New Haven as his legal home, testified to having told Judge Cleaveland, of the New Haven probate court, on the 28th day of June, 1899, that Mr. Plant was domiciled in New York "until quite recently," and the defendant Erwin, also one of Mr. Plant's attorneys, admitted on the stand that June 17, 1899, marked the termination of Mr. Plant's legal residence in New York. We have, then, primarily to consider what evidence there is of Mr. Plant's intention to change his domicile, and, secondly, the occurrences of that interval of six days that are claimed to give expression by act to the indicated intention. The defendants trace back the expression of intention to the beginning of 1898, when he spoke to the defendant Tilley of the intended unification of all his interests in one company to perpetuate his name under the title of the Henry Bradley Plant Company. This was followed in January, 1899, by a talk with Harrison, who suggested that it was unnecessary to incorporate a new company, but that an application could be made under the charter of the Southeastern Investment Company for a change of name. This was accordingly done, and on the 13th day of April, 1899, the superior court of Connecticut authorized the change. It is contended by the defendants that intermediate this date and the 23d day of June—the date of Mr. Plant's death—he had conveyed substantially all his property to the new corporation; and this is invoked as expressive of his intention to follow his property, and to acquire a domicile at the locus of his entire estate. In other words, he centralized his possessions where he had chosen to make his future legal residence, and the act is relied on to show the choice. I shall have more to say hereafter on the relation of intent to act as affecting a consummated change of domicile as well as on the relation of motive to intent. It may be well to state at once, however, as a guide through this analysis, that, whatever the motive, the record discloses unmistakable evidence of expressed intent, at least in words, of some time changing his domicile to Connecticut, and that the real question to be determined is whether that intention was ever legally carried out. It may, therefore, be conceded that the question of the transfer of Mr. Plant's property to the corporation perpetuating his name helps, as claimed by the defendants, to establish his intent, and becomes a part of its expression. In this concession, however, I am even disregarding the not unimportant fact that the idea of unification, according to the testimony of the defendant Morton F. Plant,

74 N.Y.S.—27

antedated by a number of years the idea of the acquisition of a Connecticut domicile. But treating the two ideas as correlated, it is reasonably clear that a complete transfer was not consummated during Mr. Plant's lifetime. Without cumbering this opinion with the mass of detail considered in arriving at this conclusion, it is sufficient to say that the alleged transfer was attended by suspicious circumstances, such as the conceded antedating of the certificates of stock; the record in the corporate minute books bearing on the transfer, and which professed to recite the occurrences of stockholders' and directors' meetings held months before; the loose and unbusinesslike manner in which the transfer to the Southeastern Investment Company, the name of which was changed to the Henry Bradley Plant Company, is claimed to have been made,—a transfer involving millions, not evidenced by any acknowledgment to the transferror, or by any entry in any book or record of the transferee; unmistakable contradiction by written evidence of the claim that Mr. Plant's original holdings in the Southeastern Investment Company had been removed to New Haven prior to his death, to be transferred to the new company, together with the additional shares issued to him on the occasion of the increase of the stock of the Southeastern Investment Company to the full amount provided by the charter. A repeated review of the record has satisfied me that, whatever may have been Mr. Plant's ultimate purpose, and however far he may have progressed in carrying out his unification idea, the plan had not been consummated at the time of his death. Even the certificates of the Henry Bradley Plant Company, the evidence of the completed transfer, were not made out to Mr. Plant, but, as the defendants testified, were only issued weeks after his death, and made to run to his estate. In this view of these facts it must be clear that the probative force attached to them by the defendants as bearing on the question of intention to change his domicile is much impaired. Starting from the premise that Mr. Plant contemplated a change of domicile, and proposed to do certain acts to that end, it is obvious that, if the acts themselves were not completed, the purpose, at least so far as those acts were concerned, was not carried out. Had there been a complete transfer of his estate to the new company, the intent to change would appear so much nearer realization. There was no such transfer, and while any acts done with a view towards an ultimate complete transfer must be regarded as some expression of the continuing intent, yet the absence of completion requires a rejection of this branch of the testimony as furnishing facts of much weight on the subject of consummated intent, and remits us to an examination of the other facts relied on. There are certainly in the record enough declarations of intention, mostly oral, and there is one important piece of written testimony.

On the 24th day of May, 1899, there was a discussion concerning the proposed execution of a codicil on the day following. Harrison testifies that Mr. Plant at that interview stated "that he had intended for some time to resume his home in Connecticut, his birthplace, and resume his domicile there." Erwin corroborates him, and adds that Mr. Plant proposed further changes in his will after his resumption

of Connecticut citizenship.    Morton F. Plant, less emphatic on the question of change of domicile, speaks of his father's declared intention to make another codicil in New Haven.    While the plaintiff admits that the subject of Connecticut citizenship was mooted, she asserts that the suggestion emanated from Mr. Harrison, who counseled the change as a necessary preliminary to the execution of a final codicil, and who supplemented it with the statement that it was a matter of form, and did not compel living in Connecticut. Whatever the exact occurrences of the conference may have been, we find Mr. Plant at this date—one month before his death—looking ahead to an ultimate change, formal or actual, of legal residence. Three weeks later, and on the last day of his conceded residence in New York, he writes the following letter:

"New York, June 16th, 1899.

"Mr. Edwin H. Peaslee, Chairman Finance Committee, 27th Assembly District Republican Club, 767 and 769 Sixth Ave., City—Dear Sir:  I am in receipt of your favor of the 9th inst., which has been delayed acknowledgment because of my absence from the city.  It is my expectation within a very short time to change my residence to Connecticut, my birthplace, in consequence of which I do not expect to again be able to cast my vote in New York City.  I wish for the party, however, every success and especially in national affairs.

"Respectfully,                          [Signed]      H. B. Plant."

Regardless of motive, we have here at least an unequivocal expression of intention to change his residence "within a very short time." · All that preceded this satisfies me that there was merely a gathering intent, so to speak,—the kind of intent which a man has, while fixed in a permanent place of abode, of some time settling elsewhere.    According to this letter Mr. Plant had now reached the stage when the intent had passed from passivity into activity, and expected "within a very short time" to bring about its consummation. Seven days later he was dead, and the "very short time" becomes, in effect, "immediately"; the occurrences of the four days following the date of the letter being relied on legally to effectuate the intent, and to establish by overt acts residence in the new locality.    Three overt acts are relied on by the defendants.    These will best appear by a narrative of Mr. Plant's movements from the 16th day of June to the 23d, the day of his demise.    On Friday, the 16th, at 3 o'clock, Mr. Plant, accompanied by his valet, Wilson, and a maid, Mary Cahill, left New York for Branford.    They went through to their destination without stopping at New Haven.    He took with him two bags and a basket of food.    Fannie Hinde, the housekeeper, who packed one of the bags, testifies that its contents consisted of one shirt, a pair of slippers, and stockings enough to last him for two or three days. The other bag packed by the valet contained the instruments Mr. Plant required in consequence of his illness.    The food was intended for his meals while at Branford.    It appears that he was sick while there, and left the house only once, then to go to the local cemetery. On Sunday, the 18th day of June, one of Mr. Plant's distant relatives —the wife of a second cousin—called on him.    She testifies that he told her that Mrs. Plant had not accompanied him, as he could only stay a short time, and that "he had orders from his family physician

to return on Tuesday back to his home." This witness is corroborated by her son, who accompanied her. The pastor of the Catholic church at Branford, who visited Mr. Plant the next evening,—Monday, the 19th,—testifies that he was in bed, and said that "the doctor called him home on account of his health"; that he had been ill for several days, and that he had already remained too long. The following morning—Tuesday, the 20th of June—Mr. Plant, taking his two grips with him, left Branford on the 9:08 train for New Haven. The running time between the two places is, according to the testimony of one of the conductors of the line, a little less than half an hour. At about 4 that afternoon Mr. Plant left New Haven, reaching New York at 5:30. He never returned to New Haven, and from the 16th to the 23d the only time he spent there was the interval of less than seven hours on the 20th.

We have now to examine the happenings of that interval. The maid having been sent ahead with a message to Mrs. Plant that he would be "home" in the evening, and the valet, by Mr. Plant's instructions, remaining at the depot to attend him on the return to New York, Mr. Plant went to the office of his attorney, the defendant Harrison, who testifies that he arrived there at about 10 o'clock. He remained an hour or so, talking of various matters, first giving instructions for an alteration in his will, and directing that it be redrafted for execution that afternoon. Thereafter he talked about the affairs of the Henry Bradley Plant Company, and finally of visiting that afternoon, with a view to its possible purchase, the house of a Mrs. Hotchkiss that had been pointed out to him some 11 days previous. At about this stage of the interview one Zacher, an attorney associated with the defendant Harrison, entered the room, and without preliminary Mr. Plant said to him, as Zacher testifies: "I want to say to you, Mr. Zacher, that New Haven is now my home. When in town I shall occupy my own house on Crown street, with Mrs. Hoadley, until I get another one." Harrison's version of this declaration of Mr. Plant is in this language: "I am now a resident of New Haven, Mr. Zacher, and I intend to live in my house with Mrs. Hoadley, my sister-in-law, until I get the new house ready for occupancy." The time and manner of this declaration are of great importance as bearing on all the three overt acts relied on by the defendants; acts—two of which are here foreshadowed—which occurred, if at all, subsequently to this declaration, and which were the conditions precedent to the acquisition of residence, here stated as if already acquired. The first of these alleged overt acts occurred after he left Mr. Harrison's office about noon. He went to a house in Crown street, occupied by his sister-in-law, Mrs. Hoadley, who was the widow of his half-brother. This house, devised to him by his mother, had been his property for a long time covering the period of his conceded residence in New York. Mrs. Hoadley had occupied it since 1887 at an annual rental of $600, which sum, however, she was privileged to devote to such repairs as she might require, making payment to him merely of the balance. This house was one of the first pieces of real property conveyed to the Henry Bradley Plant Company pursuant to Mr. Plant's unification scheme, the deed

being dated and acknowledged on the 15th day of April, 1899. After the conveyance Mrs. Hoadley continued occupying it as theretofore, Mr. Plant assuring her that the transfer was merely formal, the only difference being that thereafter she was to account for the rents to the new corporation. Mr. and Mrs. Plant had often stayed at this house as the guests of Mrs. Hoadley during their prior brief visits to New Haven, and it was Mr. Plant's custom on the occasion of his shorter visits to run in there for a meal.

To return now to the first overt act. It is claimed to be embraced in the statement made by Mr. Plant to Mrs. Hoadley when he called on her on the 20th day of June. Various versions are given of what transpired, and are founded in alleged statements made by Mr. Plant upon his return to Harrison's office, and upon the repetition by the plaintiff of statements made to her by Mrs. Hoadley. Two salient facts stand out in the accounts given on behalf of the defense: First, the announcement to Mrs. Hoadley of prior acquisition of residence in New Haven; and, secondly, the arrangement to board with her. According to Harrison, Mr. Plant said he had told Mrs. Hoadley he "had come to board with her." Harrison's stenographer reports Mr. Plant as saying he "would come" and board with her. Erwin claims that Mr. Plant's admission was to the effect that he had told Mrs. Hoadley that he "had fixed" his residence in New Haven, and that "he was going to board with her." In their brief the defendants select the following account, given by the defendant Morton F. Plant, as the reliable narration of Mr. Plant's repetition of the occurrence: "Jennie [Mrs. Hoadley] told me that the last time Henry was here he came up to the house and said, 'I am now a resident of New Haven, and until such time as I can get a house to live in I want you to consider me as a boarder.'" Mrs. Plant does not dispute having reported the interview with Mrs. Hoadley. But her testimony of what Mrs. Hoadley told her contains no mention of change of residence, and all reference to the boarding question is qualified as having been made jocularly. Mrs. Hoadley, the only living witness to the interview, not only corroborates Mrs. Plant, but emphatically asserts that the fact of his having become a resident of New Haven was "never mentioned" by Mr. Plant. She also gives a very credible account of Mr. Plant's "jokingly" referring to boarding with her,—credible because of their previous relations, and because of his announcement, almost in the same breath, that "he was going home that afternoon" to New York. The defendants rely on the statements to Mrs. Hoadley as showing an election to make New Haven his legal residence. That is the overt act. Two considerations suggest themselves in answer: (1) If the existence or nonexistence of the overt act is dependent on the version of the interview given by the defendants, it may well be said to have failed of proof, in that the conflict of evidence raises sufficient doubt as to the actual occurrences as to require a finding that the defendants have failed to carry the burden of proof as to this overt act. (2) I prefer, however, to reject this overt act on a theory that accepts verbatim the defendants' version of the interview above quoted. In view of Mr. Plant's declarations earlier in the morn-

ing to Mr. Zacher, in Harrison's presence, that he had already become a resident of New Haven, and in view of his prefatory assertion to Mrs. Hoadley that he was then a resident,—both occurring before any act had, in fact, been done,—the statement to Mrs. Hoadley was a mere meaningless declaration unsupported by act. Where is the act that made him a resident at that time when he began to talk about boarding? Does he not rely on acts to be performed to establish an act claimed to have been already consummated? The arrangement about boarding is not, in itself, the act, because that is stated as an accomplished sequence of residence. Beyond this, even if the boarding should be relied on as the act, it remains that he never did, in fact, board with her. The statement was made after he had taken luncheon there, as he had often before. The entire conversation concerning boarding took place as he was putting on his overcoat to leave. Even if he did then say, "I want you to consider me as a boarder," neither his say so nor Mrs. Hoadley's so considering him would make him a boarder in act. In other words, all that this entire conversation reduces itself to is a further expression of intention, especially in view of his then avowed purpose to go "home" to New York, the bearer of the kindly regards of Mrs. Hoadley to Mrs. Plant.

So much for the first overt act. As yet we have not gotten beyond intention. The second overt act is claimed by the defendants to be "the purchase of the Church street house from Mrs. Hotchkiss, and his insistence upon immediate possession of it in order to make alterations therein." After leaving Mrs. Hoadley Mr. Plant returned to the office. There, according to Harrison and the stenographer, he indulged in the declarations of the Hoadley interview already referred to, and, that done, he set out shortly after 2 o'clock, in company with Mr. Harrison, to perform that which the defendants designate as the second overt act. They went to the house of a Mrs. Hotchkiss, located in the immediate vicinity of the office. Up to that time Mr. Plant had never been inside of it. On the 10th of June,—10 days previous,—however, he had, together with Mrs. Plant and Harrison, driven around New Haven looking at various houses from the outside, but without leaving the carriage, and among others the Hotchkiss house had been pointed out by Mrs. Plant as an apparently desirable location. Mr. Plant had asked whether the house was for sale, and instructed Mr. Harrison to make inquiries. No offer or price had been made until the 19th, when Mrs. Hotchkiss expressed a willingness to sell for $85,000. This offer was communicated to Mr. Plant on the 20th, before he went to look at the premises. Arriving there, Mr. Plant began by examining the house, Mrs. Hotchkiss and her daughter acting as his guides. These ladies testify that Mr. Plant examined up to the third floor, looking at closets, stairs, and cellar; that he inquired whether an elevator could be placed where the back stairs came up from the basement to the first floor; that he made some statements to the effect that he wanted to use the basement exclusively for an office; that the suggestion was made that he did not need the back stairs from his office to the first floor, and that Mr. Plant replied, "It

is my residence, sir." This was before there had been any expression on the part of Mr. Plant as to whether or not he was satisfied with the house, and the meaning the defendants would inject into the statement that, as he was going to live there, he needed the back stairs for his servants, is hardly consonant with the assertion that the first floor was to be given entirely up to business offices. There was also some question about building a vault in the basement. After the examination was concluded, Mr. Plant, according to Mrs. Hotchkiss, asked when he could get possession, and that she replied that it would be very inconvenient for her to dismantle the house during the warm weather, but that he could have full possession by October 1st. In the meanwhile, however, she could arrange the basement by closing it, so that he could commence work as soon as he wished upon the vault that he spoke of putting in there. According to the defendant Harrison, Mr. Plant asked whether he could "come in the last of the week." He desired to bring Mrs. Plant on Friday to discuss what changes were desirable. Up to this time no mention of a sale had been made, nor had the terms been discussed. All the testimony on this point is contained in the statement of Mrs. Hotchkiss, in which she is corroborated by her daughter and Harrison, that, after the examination of the house and the conversation referred to, Mr. Plant spoke aside to Harrison, who then said to Mrs. Hotchkiss that Mr. Plant was pleased and satisfied with the house and price. No papers were drawn up, no memorandum was signed, nor was any time set or fixed for concluding the transaction or reducing the contract, if there was one, to writing. Seven months after Mr. Plant's death the house was bought by the Henry Bradley Plant Company, which did not, however, take possession until April 1, 1900. No alterations had been made in the house at the time of the beginning of this trial, and the premises had been then untenanted for nearly a year. In this narrative I have again accepted the defendants' version, and disregarded the plaintiff's contention that the acquisition of the Hotchkiss house, of which Mr. Plant had never mentioned one word to her, was purely for the business purposes of the Henry Bradley Plant Company, a contention which seems plausible in view of the carrying out of the alleged purchase months after Mr. Plant's death.

Conceding, therefore, that Mr. Plant made all the statements ascribed to him, is there here again anything more than °a mere expression of intention? Perhaps an intention more definitely developed than four days previous, when Mr. Plant addressed the letter to the finance committee of the Republican club, but still only an incompleted purpose. His acts may have been expressive of intention, but they did not consummate it. The Hotchkiss incident furnishes no definite act. Mr. Plant enters a house for the first and only time in his life, makes inquiries with a view of its possible ultimate acquisition. All the questions relating to its adaptability to his wants preceded the expression of satisfaction as to the house and price, as it would in the case of any other place he might examine. Even the "It is my residence, sir," upon which so much stress is laid, was a similar preliminary statement, and cannot be held to mean more than,

in case he decided to take the house, it would become his residence. In view of the surrounding facts and circumstances, that phrase can impossibly be twisted into an assertion of present acquisition of domicile. At that time he had not bought, nor expressed a willingness to buy. No details necessary to the consummation of a purchase had been arranged. Everything was tentative. He could not get possession before October 1st, but might make repairs earlier, but then only in the lower story. Even the commencement of making the repairs, had the transaction progressed to that stage, would hardly, in view of delayed possession of the entire premises, have amounted to a sufficient act. When he left the Hotchkiss house, things had progressed no further than that Mr. Plant had seen a house which pleased him at a price which satisfied him. Much was yet dependent on Mrs. Plant. The unconsummated intention is emphasized by a letter which the defendant Harrison wrote at Mr. Plant's request on the day after his return from New Haven, to the effect that Mr. Plant "was well satisfied with the house," and that, unless notified to the contrary, he would come there with Mrs. Plant on Friday. That statement, so far from being consistent with ownership that waited merely on the reduction to writing of a contract of sale, showed only that he was entertaining the proposition with much favor. The two overt acts—the Hoadley and the Hotchkiss incidents—filter down to this: He had arranged with Mrs. Hoadley to board with her some time in the future, but never lived to return. He had arranged to go further into the purchase of the Hotchkiss house, and never lived to accomplish it. I am not to consider what he might have done had he lived, but merely what he had done. Boarding which he never did, and ownership which he never acquired, cannot beget an act, however pregnant the intention.

I have left for the last the third alleged overt act,—declarations made by Mr. Plant to various persons that he was a resident of New Haven. He began making these in the defendant Harrison's office before going either to Mrs. Hoadley or to Mrs. Hotchkiss. The other declarations were made after his return from the Hotchkiss house. Upon leaving there he returned with Harrison to the latter's office, and executed the codicil, which in the morning he had directed to be changed. In this codicil he described himself as of New Haven. This description would have probative force had it been based on precedent domiciliary acts, and any force it may have as a declaration is weakened by the fact that on the 9th of June, according to Mr. Harrison, a draft of this codicil was presented to Mr. Plant, wherein he was then already described as a resident of New Haven. After the execution of the codicil, and about the middle of the afternoon, Mr. Plant left for the railway station, where his valet was awaiting him. There he met two acquaintances, Messrs. Barton and Rawson. To them he said: "By the way, I am a resident of New Haven now. I have bought a house here, and I am coming here to live." This was his last act in New Haven. He thereupon boarded the train, returned to the house at 586 Fifth avenue, and never again set foot in the alleged new domicile. The record, however, shows that he made two further declarations of similar purport

in New York,—one the day following to his son, the defendant, Morton F. Plant; and the other the day after to the defendant Erwin. Even considering these declarations without relation to the other acts transpiring after Mr. Plant's return to New York, I attach but slight importance to them,—First, in view of the analysis of the precedent overt acts, which were necessary to give vitality to the declarations; and, secondly, in view of the unsolicited announcement to Zacher in the morning that New Haven was even at that time his home, when the question of domicile was quite foreign to the subject of their conversation, and when, even on the defendants' theory, he had not arranged to board or to buy. Declarations are always, for obvious reasons, inferior to acts. Doucet v. Geoghegan, 9 Ch. Div. 441; The Venus, 8 Cranch, 253, 281, 3 L. Ed. 553. Rather than being evidence of facts relating to domicile, they are merely explanatory of them when otherwise shown. Jac. Dom. § 454. Little stress is to be placed on them as against a man's actions and course of conduct. Sherwood v. Judd, 3 Bradf. Sur. 267; Petersen v. Bank, 32 N. Y. 21, 88 Am. Dec. 298. Declarations are primarily valuable as expressive of intention, but they are not controlling, and are subject to being overcome by "other and more reliable indications of the true intention." Isham v. Gibbons, 1 Bradf. Sur. 69; In re Zerega's Will (Surr.) 20 N. Y. Supp. 417. · They often serve to turn the scale when they are not inconsistent with acts, "but it is otherwise if they are contradicted by the acts and general conduct of the person making them." Jac. Dom. § 455. In the paragraph just cited the learned author aptly says: "The time, occasion, and manner of making them, the reasonableness and consistency with themselves and with the other proven facts in the case, the presence or absence of the suspicion of sinister purpose in making them, * * * enter materially into the estimation of their value." Written declarations, like oral ones, must be considered in the light of all the circumstances of the case. While they are prima facie entitled to more weight, as being presumably made with greater deliberation, yet even they are within the class that have been designated as the "lowest species of evidence." Kreitz v. Behrensmeyer, 125 Ill. 197, 17 N. E. 232, 8 Am. St. Rep. 349. For this reason, as well as for that as being in conflict with acts, do I reject as in any wise controlling Mr. Plant's description of himself as of New Haven in the last codicil and in the deed executed in New York the day after his return from New Haven. These written declarations are, in this case, at least, to be treated like the oral ones. Tucker v. Field, 5 Redf. Sur. 139; Isham v. Gibbons, supra; In re Zerega's Will, supra; Attorney General v. Pottinger, 6 Hurl. & N. 733.

I have now examined at length the overt acts, traced Mr. Plant's movements from the day he left New York until the day he returned, and found nothing in the facts relied on by the defendants to bring about the change of domicile. Were there any doubt in my mind either as to the effect to be given to the Hoadley and Hotchkiss incidents or to the declarations, Mr. Plant's acts and general conduct after leaving New Haven show such inconsistency

with a consummated change of domicile that all doubt would fade. I find not only that there was no animo manendi, but more particularly that he never left New York sine animo revertendi. The original fact that stands out in the whole narrative is that there was no abandonment in law or in fact of his New York domicile. I am not unmindful of the decisions where a man, after acquisition of another domicile, comes back to prepare for removal, or on a visit, or pursuant to a desire to spend part of his time in his earlier legal residence. After unequivocal establishment of domicile elsewhere, the mere fact of return is quite unimportant. That would, at most, be act only without intention. In this case the fact of return, however, must be read in connection with all the circumstances of the case, and in that aspect reflects seriously both on intent and on act. I repeat, the fact and manner of his return is of prime importance. The New Haven domicile is alleged to have been acquired in the course of his brief stay there on the 20th of June. At its conclusion he rejoins his valet at the station, where the latter had been directed to wait for him to go back "home." He returns to New York, goes straightway to his old house, where his coming was awaited, and in which, so far from any change having taken place, either in the interior arrangement or in the ménage, things were moving in the same grooves as they had for 30 years past. He announces no change to his household. He resumes the routine of his life where he had left off four days previous. He tells the housekeeper the same evening that "he was very glad to be home again." He tells his wife, in the presence of the housekeeper, that on the following day he proposed to go to the Riverside Drive to look at a house, with a view to purchase, as the house they occupied was on leased property, and he wanted one with an elevator in it. He gives instructions to his coachman to call for him the next afternoon to drive there. The following morning he goes to his office in Twenty-Third street for the same hours as for years theretofore, and while there he writes a letter to the defendant Erwin, saying that, "I was rather tuckered out when I got home from New Haven." He returns to his house at the usual time. When the coachman calls for him as ordered, he is feeling unwell, and postpones the drive to the morrow. In the course of that day, while continuing as theretofore the uninterrupted routine of his New York life, he executed a deed of Halifax property to the Henry Bradley Plant Company, describing himself in New York as a resident of New Haven. The acknowledgment was taken in New York, but subsequently certified as having been taken in New Haven. This fact, as much as any, shows the character of the would-be domicile in New Haven as purely nominal in any event, and obviously acquired for ulterior purposes. On the next day he attends his office as usual, and makes an appointment with a friend, Mr. David B. Sickles, to meet him at his house the following Tuesday evening, several days after the contemplated return to Branford. He tells an employé of the office that he was "home early." After his return to the house at the accustomed hour, the carriage came for the proposed drive. Mr. Plant, however, was again unable to go, being

taken down with the illness which on the day following resulted in
his death.

While I do not attach too much importance to Mr. Plant's fre-
quent use of the word "home," in the sense of giving to it the effect
of legal residence, yet it is most significant in pointing his own con-
ception of the pretended change, and his own treatment of it as
nominal merely. Colloquially, people speak of that place as "home"
which in the overwhelming majority of cases legal construction de-
clares to be domicile. If Mr. Plant considered himself a resident of
New Haven by virtue of the occurences culminating on the 20th
day of June in New Haven, I am quite satisfied that his intent was
not bona fide. I am not concerned with what further acts he might
have performed had he lived. The fact is he made declarations
of present acquisition of domicile in New Haven at a time when
there had been no actual residence, and when there was absence
of any sufficient indication of intention of making it his perma-
nent home. It must be obvious that Mr. Plant was acting under
the guidance of his Connecticut legal adviser, who directed his steps,
and prompted to him the declarations he was to make in the at-
tempt to reach the goal. In fact, Mrs. Plant testified that the de-
fendant Harrison had several times asserted that the change to
Connecticut was a "matter of form" merely. It does not require
an extensive search to discover motive. Mr. Plant's proposed tes-
tamentary disposition was invalid under the laws of New York, but
valid under the laws of Connecticut. Beyond this very obvious
inducement to acquire a New Haven domicile, there are more or
less definite items of evidence showing a desire to escape New York
burdens of taxation. On the whole record this seems to me to be
one of those exceptional class of cases where motive has a not un-
important bearing on the question of domicile. Jac. Dom. § 142;
Dicey, Dom. 145; 10 Am. & Eng. Enc. Law, 20; Briggs v. French,
2 Sumn. 251, Fed. Cas. No. 1,871; Butler v. Farnsworth, 4 Wash.
C. C. 101, Fed. Cas. No. 2,240; Morris v. Gilmer, 129 U. S. 315, 9
Sup. Ct. 289, 32 L. Ed. 690. I am not considering motive as de-
termining the change of domicile, but merely as reflecting on the
bona fides of the intent. Ordinarily, the question of motive is quite
immaterial in the solution of questions of domicile, inhabitancy, or
citizenship. The law does not inquire into a man's reason for chan-
ging either his national or municipal domicile. Relief from the bur-
dens of taxation may constitute a very proper motive, and one that
becomes quite irrelevant if the change animo et facto is otherwise
established. McConnell v. Kelley, 138 Mass. 372; Thayer v. City
of Boston, 124 Mass. 132, 26 Am. Rep. 650. As Judge Story puts it
in Briggs v. French, 2 Sumn. 251, Fed. Cas. No. 1,871: "Provided
the removal be real, and not merely nominal, and he has truly become
a citizen of another state, I have never understood that his motive
of this act is inquirable into;" or, as he said in Case v. Clarke, 5
Mason, 70, Fed. Cas. No. 2,490: "His removal must be a real one,—
animo manendi,—and not merely ostensible." As evidence of in-
tention, however, motive is important. It becomes significant "from
its effect as evidence for the existence or nonexistence of the animus

manendi." Dicey, Dom. 145. It very often becomes "a circum-
stance to question the bona fides and reality of the removal or the
change of domicile." Briggs v. French, supra. Motive may be said
to illumine the good faith and to help materially in elucidating in-
tent. In the case at bar, although it is by no means necessary to
disprove Mr. Plant's intention of remaining, the light which motive
furnishes throws into stronger relief the transparent, ostensible,
and nominal attempts made to become domiciled in Connecticut.
Independent of no motive, Mr. Plant never in fact abandoned his
New York domicile, nor did any act from which the fact of changed
residence could be inferred. Read in the light of motive, the expres-
sion of the intent, even so far as it went, loses much of its legal
vitality.

It is proper at this stage, for the purpose of completeness, to
make reference generally to the defendants' authorities on the ques-
tion of domicile. Here again the caution is necessary that every
case of domicile must be determined in the light of its own facts
in their relation to each other. In the view that I take of the
facts of this case, I find no abandonment of the old, no residence
in the new, domicile. All the cases relied on by the defendants
show unequivocal abandonment of residence. Guier v. O'Daniel,
1 Bin. 349, note, emphasizes the necessity of constant residence,
rather than the manner of it. But it requires the present act, wheth-
er that be "on rent, at lodgings, or in the house of a friend," to
show the constant purpose. Railroad Co. v. Ohle, 117 U. S. 123,
6 Sup. Ct. 632, 29 L. Ed. 837, was a case where the jury found, on
submission to it of the question of good faith, that the defendant
had, with bona fide intent, abandoned his Illinois domicile for the
purpose of acquiring one in Wisconsin. This case is one of the
many where the right to remove from one jurisdiction to another
in order to bring suit has been recognized and upheld where the
bona fide intent to reside permanently has been established. White
v. Tennant, 31 W. Va. 790, 8 S. E. 596, 13 Am. St. Rep. 896,—much
relied on by the defendants,—is in every way an exceptional case,
but, even as such, not in conflict with the one at bar. The question
was the domicile of an intestate, who, up to April 1, 1885, had his
domicile in West Virginia. He had sold his farm, and given the
purchaser possession on that date. Prior thereto he had arranged
with other members of his family to move to a farm in Pennsyl-
vania. On the 2d day of April he started for his Pennsylvania house,
but, being overtaken by rain, he stopped at a relation's in West
Virginia, where he died. It is apparent that there was here an
unequivocal abandonment of the old domicile "sine animo rever-
tendi." The bona fide intention to reside permanently in Penn-
sylvania was seized upon to supply the lack occasioned by inability
to occupy the future home. He was held technically domiciled there,
partly because for purposes of succession a man must always have
one legal domicile, and partly because it would have been absurd
and impossible to declare that he had two. Having abandoned the
one, that could not be his domicile. Being en route "for the ex-
pressed purpose of making a fixed place his home for an indefinite

time," that was logically declared to be his legal residence. In Bradley v. Lowry, Speers, Eq. 1, 39 Am. Dec. 142, there was deliberate abandonment of the South Carolina domicile. In Thayer v. City of Boston, 124 Mass. 132, 26 Am. Rep. 650, the question of good faith was properly left to the jury. On a charge, as in that case, "which of the two places does he in good faith and honestly regard and recognize as the home of himself and his family, if he has one?" it seems that a jury in this case, under proper instructions, could hardly go astray, and declare Mr. Plant domiciled in New Haven. In Bell v. Kennedy, L. R. 1 H. L. Sc. 307, 319, there was at least a "short residence." So in Craigie v. Lewin, 3 Curt. Ecc. 435, 448, one day is recognized "sufficient, provided the animus exists." And similarly in these cases: Moorhouse v. Lord, 10 H. L. Cas. 272, Johnson v. Twenty-One Bales, 2 Paine, 601, Fed. Cas. No. 7,417, and McLean v. Janin, 45 La. Ann. 664, 12 South. 747. In Marks v. Marks (C. C.) 75 Fed. 321, there was an abandonment of a Tennessee domicile and a mere arrival in Texas. The domicile of origin was held sufficient, even though there had been no location at a particular point. Arrival, however,—physical presence,—even in the domicile of origin, was deemed essential. There was a "beginning of her residence in Texas." Petersen v. Bank, 32 N. Y. 21, 88 Am. Dec. 298, though showing many points of similarity in its facts with this case, has the distinguishing feature that there was the actual acquisition of a residence in New Haven, with the absolute determination permanently to occupy it. On the facts there disclosed I should not hesitate in going even further than did the court, and hold that the manner of his living in a hotel in New Haven, contrasted with his manner of living in a hotel in New York, coupled with his unequivocal expression of bona fide intention, made him a resident of New Haven even prior to his acquisition of a dwelling house.

A final word should be said in relation to the defendants' argument that, Connecticut being Mr. Plant's domicile of origin, he immediately reacquired it upon his election that New York should no longer be his legal residence. Even conceding abandonment of the New York domicile of choice, the defendants' argument proceeds rather along the line of the English cases (Udny v. Udny, supra) than along that of the American ones (Jac. Dom. § 114), the difference between which has already been adverted to. In the view I take of the case, however, I do not reach the question of reverter at all, as I hold that there has been no abandonment of the New York domicile. I do not follow the defendants in their argument that a mere election to abandon, exercised under circumstances where there was a continued physical residence in the domicile elected as abandoned, will cause a revivor of the domicile of origin. Such a thesis, I take it, would be quite revolutionary of the entire law of the change of domicile, and supplant the inseparable animo et facto by animo merely. The mere statement contains its own refutation.

Mr. Plant, then, died a domiciled resident of the state and city of New York. Here was the situs, therefore, of his vast personal

property; here the jurisdiction where his will should have been. admitted to probate; here it should have been interpreted, and declared valid or invalid, according to the law and practice of our courts; here administration and distribution should have been had. Rejecting for the moment all purely legal and technical questions flowing from the proceedings in Connecticut, we have a case where the facts establish domicile as well as residence in New York, uninfluenced by the ineffectual attempts to secure domicile in New Haven, with an intent that was not consummated, even if bona fide, and a motive that was ulterior. The facts presented a case where probate proceedings unhesitatingly should have been instituted here. They were had elsewhere, and the immediate legal question for consideration is whether the erroneous assumption of jurisdiction by the Connecticut courts has concluded our own from taking action and declaring the correct domicile of Mr. Plant, whatever the resultant consequences of such legal pronouncement may be. What, then, is the scope and effect of the record of the New Haven probate proceedings before me? The defendants urge with plausibility that the decree of the probate court for the district of New Haven, admitting the will of Mr. Plant to probate as the will of a domiciled resident of Connecticut at the time of his death, is. a bar to this action, and that in the absence of some direct attack setting aside or reversing the Connecticut proceedings the decree is proof against collateral attack in this court. Their forceful argument may be briefly outlined as follows: The plaintiff herself invoked the jurisdiction of the Connecticut court, and signed the petition for the probate of her husband's will. The probate court of Connecticut thus had jurisdiction of the person. Having general jurisdiction over the matter of the probate of wills, it had jurisdiction of the subject-matter. An erroneous exercise of jurisdiction is not equivalent to judicial action without jurisdiction. The former can be attacked only by a direct proceeding for reversal; the latter is invalid wherever the action is invoked. So, in this case, an erroneous conclusion on the question of domicile does not devest the probate court of jurisdiction over the general matter of wills, and can, therefore, be rectified only by some direct proper review of his decree, for the question of Mr. Plant's domicile at the time of his death was in no sense a matter going to the jurisdiction for the probate judge over the subject of the probate of wills, but was a. question which, in the exercise of his jurisdiction, he was judicially to determine. He was to determine judicially what may be termed quasi jurisdictional facts, without allegation and proof of which the court could not be set in motion. Where there is jurisdiction of the person and general jurisdiction of the subject-matter, the court then has the power to pass upon the quasi jurisdictional facts involved in the particular case; and its judgment that it has jurisdiction is final, at least so far as any collateral attack is concerned. The probate court, then, having had jurisdiction of both person and subject-matter, no grounds exist upon which the courts of this state can, under the constitution of the United States, refuse to give due effect to the decree of the Connecticut court. The de-

fendants' argument is supported by numerous and well-chosen authorities, and in their own language may be summarized as follows:

"A party cannot, after invoking the jurisdiction of a probate court in Connecticut upon an application for the probate of a will, and after the question of the domicile of the decedent at the time of his death has been raised, and evidence has been taken thereon by the court, and the court has judicially determined upon such evidence the question of domicile, attack such judgment or decree collaterally anywhere."

It now behooves to examine the applicability of this principle under the law and facts of this case. The constitution of the United States (article 4, § 1) provides:

"Full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state; and the congress may, by general laws, prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof."

Congress prescribed the effect by the statute of May 26, 1790, now embodied in section 905 of the Revised Statutes, which, after providing how the judgment of a sister state shall be authenticated, continues:

"And the said records and judicial proceedings, so authenticated, shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the state from which they are taken."

Since the first authoritative interpretation of these provisions in the case of Mills v. Duryee, 7 Cranch, 481, 3 L. Ed. 411, which was first misread to preclude jurisdictional inquiries, the rule has been uniformly announced through a long line of cases that foreign judgments shall have the same effect as in the home forum. Hampton v. McConnel, 3 Wheat. 234, 4 L. Ed. 378; Christmas v. Russell, 5 Wall. 290, 18 L. Ed. 475; McElmoyle v. Cohen, 13 Pet. 312, 10 L. Ed. 177; Bank v. Farnum, 176 U. S. 640, 20 Sup. Ct. 506, 44 L. Ed. 619; Embry v. Palmer, 107 U. S. 3, 2 Sup. Ct. 25, 27 L. Ed. 346. Inquiry into the jurisdiction is always open, but beyond that the sister state judgment is to receive the same "faith and credit" that it has in the home forum. We may not give it less effect than in the forum of its rendition. We are not required to give it greater. In fact, we may not. Board of Public Works v. Columbia College, 17 Wall. 521, 21 L. Ed. 687; Robertson v. Pickrell, 109 U. S. 611, 3 Sup. Ct. 407, 27 L. Ed. 1049; Suydam v. Barber, 18 N. Y. 468, 75 Am. Dec. 254; Wood v. Watkinson, 17 Conn. 500, 44 Am. Dec. 562. In the first case in which the decree of an inferior state court was relied on in another jurisdiction as establishing the undisputed debt necessary to the maintenance of an action, the court refused to treat the decree as final, where the appellate court in the original jurisdiction had regarded it as interlocutory merely. "No greater effect can be given to any judgment of a court of one state in another state than is given to it in the state where rendered. Any other rule would contravene the policy of the provisions of the constitution and laws of the United States on that subject." At page 529, 17 Wall., and page 691, 21 L. Ed. "No case can be found," say the court in Suydam v. Barber, supra, "where a greater

effect is given to the judgment of any state in the courts of another than belongs to it in the state where it was rendered." Wood v. Watkinson, supra, states the rule clearly as applicable to the case at bar. Where there is no objection as to validity on the ground of want of jurisdiction, "it is well settled that no greater effect is to be given to it than it would have in the state where it was rendered. It has no higher dignity in any other state than in the one where it was pronounced; and hence, if in the courts of the state where the judgment was rendered it is inconclusive, or if it is inquirable into there during a particular period, or on certain conditions, it will be open to investigation to the same extent everywhere else." 17 Conn., at page 505, 44 Am. Dec. 562.

There being no distinction between foreign and sister state judgments as a cause of action or as a defense (Black, Judgm. § 826), we have now to examine the status of the Connecticut law. The decree of the probate judge of New Haven admitting the will of Mr. Plant to probate as the will of a resident of New Haven is conclusive here if it is conclusive there. If a collateral attack can be made upon it there, then such an attack can be made here with the resultant consequence of declaring his correct domicile as I have declared it, and of admitting his will here as that of a resident of this state at the time of his decease. The faith and credit given by law and usage by the Connecticut courts to a probate decree when attacked collaterally in the courts of Connecticut is what we must now turn our attention to. As was said in Bank v. Farnum, supra, the question is not answered by referring to general principles of law, by determining what at common law was the significance and effect of a judgment, but can be answered only by an examination of the decisions of the courts of Connecticut. It may be said at the outset of this branch of the discussion that the defendants' position would be well-nigh unexceptionable, were the judgment or decree one rendered in the great majority of the states of the Union.

Let us trace the law of Connecticut on this subject. We may accept as a starting point what is there settled beyond dispute,—that the decree of a court of probate, in a matter within its jurisdiction, is as conclusive upon the parties as the judgment or decree of any other court, is invulnerable collaterally, and is subject to correction or revision only on appeal. Gates v. Treat, 17 Conn. 388; Judson v. Lake, 3 Day, 318, 326; Appeal of Mix, 35 Conn. 121, 95 Am. Dec. 222; Lockwood v. Sturdevant, 6 Conn. 373. What, then, is a matter within the jurisdiction? Four cases will answer this question. They are Sears v. Terry, 26 Conn. 273; Bank v. Balcom, 35 Conn. 351; Appeal of Olmstead, 43 Conn. 110; and Appeal of Culver, 48 Conn. 165.

Sears v. Terry is the foundation case. This was an action on contract. The defendant denied liability on the ground that at the time of making the contract he was incapacitated from entering into it by virtue of the appointment by the probate court of a conservator of his person and property because of lunacy. The defendant in the lower court offered record evidence of the appointment of the conservator by the probate court for the district of Plymouth. The

plaintiff objected to its admission on the ground that it did not show jurisdiction in the probate court to appoint the conservator. The decree, after reciting the contents of the petition, to the effect that due application had been made by the relatives of the defendant, "of said Plymouth"; that he had become incapable of taking care of himself and his affairs, by reason of insanity; that he was the owner of personal property situated in Plymouth; and the fact of the due and legal service of the petition on the defendant,—continues, "And now the court, having inquired, doth find the facts set forth in said petition to be proved and true." The decree concluded by appointing a conservator. On the trial the court admitted this record in evidence; holding, however, that it was not conclusive upon the jurisdictional facts, but only prima facie evidence, and that the plaintiff, being a stranger to it, might prove that the defendant was not a resident of the district, and that the statutory notice had not been given to him. Upon parol evidence offered by the plaintiff, the court found that at the time of the service the defendant resided at White Plains, in New York, and that therefore no notice had been left at his usual place of abode. The appointment of the conservator was consequently held invalid and no bar, and judgment was rendered for the plaintiff. The judgment was affirmed by the supreme court, and in so doing it directly sustained the collateral attack on the conservatorship proceedings in the probate court The argument was, briefly, that no presumption existed in favor of a court of limited and inferior jurisdiction, and that a person who would avail himself of the judgment of such a court must aver and prove the facts necessary to give it jurisdiction; that it was "most obvious" that the probate court of the district of Plymouth could not appoint a conservator over a person who did not reside in the district, nor until notice and summons by copy had been left 12 days previously at the usual place of abode of the defendant; that the defendant did not so reside, nor had the notice and copy been so left; that the defendant was therefore not within the jurisdiction of the court, nor duly summoned and made a party to the proceeding, as required by the statute, and could therefore not be concluded by the ex parte proceeding. Summing up its reasoning, the court places its conclusions on the precise ground "that a court of probate, in appointing a conservator, can proceed only in the case specified in the statute, and in the manner there prescribed, leaving those jurisdictional facts open to inquiry and disproof." It is to be observed that in that case the probate court had general jurisdiction of the subject-matter,—conservatorship proceedings,—and that the finding in the decree appointing the conservator to the effect that the court had "inquired" into the fact of the incompetent's residence and into the due service, and had found both true, as alleged in the petition, was in no wise questioned. Though, on the face of the decree, the court had inquired into the jurisdictional facts, and passed upon them in the act of finding them true, yet collateral disproof of these jurisdictional considerations was nevertheless permitted. The fact of the inquiry having been had was not attacked. It was the effect of the result of the inquiry. The defendants are in error when they construe this case as identical in its

74 N.Y.S.—28

reasoning with the decisions which hold that the judgments of a sister state can be set aside for want of jurisdiction, when the defendant in the suit in which the judgment has been rendered has not been properly served with a summons. The service question in Sears v. Terry was subsidiary and secondary. Domicile, residence, and usual place of abode were the fundamental and jurisdictional facts. If the defendant resided in the district of Plymouth, and had his usual place of abode where the notice to appear had in fact been left, then the service would have been adequate; but, as the defendant resided in New York, he had not been duly summoned, and the service was therefore insufficient. Domicile was the underlying question, and the proceeding stood or fell according to the finding where that was. One point must at this stage be observed in limitation of this case. The plaintiff, who was permitted to make the collateral attack, was a stranger to the conservatorship proceedings. But from other language in the case it is questionable whether, in view of the import which the Connecticut courts then gave, and have since given, to the judgments of their probate courts, the presence or absence of that fact would in any wise preclude "inquiry and disproof" collaterally into and of the jurisdictional facts. Thus the court propounds to itself this question:

"Has a court of limited and inferior jurisdiction power to determine its jurisdictional facts to the exclusion of all collateral inquiry by a person who is affected by the judgment, and who was not present"? 26 Conn., at page 280.

In answering this question the fact of the presence of the person attacking is omitted or disregarded, the court saying:

"We need not examine at length the general question whether a court that does not proceed according to the course of the common law, but exercises a restricted and special jurisdiction under some provision of the statute law, can, according to the authorities, or the reason of the thing, conclusively find the facts essential to the exercise of jurisdiction. The case on trial does not, in our view, require it; still we do not hesitate to say that, after considering the authorities which have been read to us on the trial, we have a strong impression that such is not the law."

The court then proceeds, by argument from principle and authority, to support this dictum, but concludes by placing its decision on the more precise ground above quoted. That ground must be held to have established for the courts of Connecticut, at least, this proposition: In the case of that limited and inferior court known as the "Probate Court," which does not proceed according to the course of the common law, the question of domicile, declared after inquiry, and made the basis of the appointment of a conservator, can be attacked collaterally in another proceeding. Anybody relying on that judgment or decree must prove the jurisdictional facts, and disproof of them in any proceeding invalidates the court's pronouncement.

I have examined this case at some length, because it is the foundation authority for the rule on which this decision depends. It is authority for the proposition that the decree of a court of probate may be collaterally attacked for want of jurisdiction after inquiry.

and it foreshadows the latter doctrine that under no circumstances can a court of probate conclusively determine the facts giving it jurisdiction, whether those facts be quasi jurisdictional or otherwise. Let us now turn to the development of the rule.

The next case in the point of time is Bank v. Balcom, supra. There the principal question was the domicile of a decedent. Her administrator claimed it was in Connecticut, as against the claim of the administrator of the estate of her husband, who claimed it was in New York. In letters taken on both estates in Connecticut, on the ground of property within that state, the decree in each proceeding described the intestate as domiciled in the state of New York. For aught that appears in the report of the case, the decree was made ex parte in each instance. A collateral attack was permitted, and the decedent's domicile declared to be in Connecticut.

"Again, it is claimed that the court of probate for the district of New Haven granted letters of administration on the estate of Mr. Lewin as domiciled in the state of New York, and it is insisted that this is conclusive on the subject. But the judgment of a court of limited jurisdiction is never conclusive of a jurisdictional question. Its jurisdiction may always be controverted." 35 Conn. 358, 359.

Sears v. Terry is relied on in support of the conclusion. The important point to be here observed is that the New Haven court which granted the letters had general jurisdiction of the subject-matter,—the administration of estates,—but that nevertheless its conclusion on what the defendants term the "quasi jurisdictional fact of domicile" was held collaterally assailable. In other words, conceding that determinations on quasi jurisdictional facts would be invulnerable collaterally, the case of Bank v. Balcom is further authority for the proposition that what is elsewhere quasi jurisdictional is in Connecticut, so far, at least, as the probate court is concerned, purely jurisdictional.

The third important case is Appeal of Olmstead, 43 Conn. 110. The will of one Olmstead was admitted to probate as a resident of the district of Bridgeport. Commissioners were appointed to pass upon claims against the estate. These commissioners sit as a court, and are quite independent of the probate court which appoints them, and which has no power to revise, alter, or modify their doings. An appeal from them lies not to the probate court, but directly to the superior court. Appeal of Moss, 36 Conn. 212. The finding of the domiciliary fact by the probate court is in no wise directly before the commissioners. Any attack made in the proceedings before them is necessarily collateral, and an attack made in the superior court on an appeal from the commissioners, without any appeal from the decree of the probate court admitting the will, is purely a collateral attack on the jurisdictional finding made as to residence. In the Olmstead Case such a collateral attack was permitted and sustained. There an appeal was taken from the doings of the commissioners to the superior court on the ground, among others, that Olmstead was not a resident of the district of Bridgeport, but of that of Woodbury, and that therefore neither the probate court nor the commissioners had any jurisdiction in the settlement of the estate. In Connecticut

the appeal to the superior court acts, in effect, as a vacatur of all the doings of the commissioners, and brings the whole case into that court for hearing and trial as though there originally. 43 Conn., at pages 115, 116. When the Appeal of Olmstead was tried in the superior court the appellant offered evidence to show the residence of Olmstead in Woodbury. The evidence was rejected on the ground that that was not the proper time to test the question of the jurisdiction of the probate court, and the doings of the commissioners were therefore affirmed. On appeal to the supreme court of errors, the judgment of the superior court was reversed. The fact of residence was treated as a strictly jurisdictional fact.

"It is for the interest of the court * * * to know as early as possible that it has no jurisdiction, if such be the fact. If the information does not come early, it must not be rejected if it comes late. Whenever and however it comes, it should be received as the suggestion of an amicus curiæ. and the proper legal action promptly taken." 43 Conn., at pages 114, 115.

It was urged that the commissioners could not pass upon the question of their own jurisdiction, nor upon that of the probate court, and that therefore there was no power in the superior court to consider the question. After arguing that even the commissioners would have power to entertain the collateral attack as to the fact of residence, the opinion proceeds on the concession that they have not, and yet finds the power of the superior court unaffected to entertain the attack:

"The attention of the court being called to it, one course only could be lawfully taken, that is to dismiss the case. If one party or if both parties insisted upon a judgment on the merits, it would make no difference; the court could do nothing lawfully but dismiss the case."

The court cites with approval the rule that—

"Want of jurisdiction, especially of a court of limited and special jurisdiction, cannot be aided by any waiver of exceptions, or even by express consent. If this is true in ordinary cases, it is so a fortiori in a case of a probate court decree granting administration."

While reasoning independently of Sears v. Terry and Bank v. Balcom, the court quoted them as recognizing the same principles.

The limitation noted on the consideration of those two cases, to the effect that the initial proceedings involved in the assumption of jurisdiction were ex parte, cannot be held to obtain in the Olmstead Case, despite the defendants' insistence to the contrary. That was not an ex parte proceeding for the appointment of an administrator, but a proceeding based on a will proved in the regular manner. The appeal was taken by William W. Olmstead, the son of the decedent, Joseph Olmstead; and the former, according to the practice prevailing in Connecticut, as elsewhere, must have been necessarily cited on the probate proceedings. At page 123, 43 Conn., the court speaks of "the will of the decedent, Joseph Olmstead, which had been duly proved." As heir, the appellant was necessarily cited; and in any event, under section 546, Gen. St. Conn. p. 135, being merely a re-enactment of the prevailing practice; notice of such probate proceedings must be given to all persons interested in the estate. Obviously the appellant, William W. Olmstead,

was a party before the court when it assumed jurisdiction by declaring the decedent's residence in Bridgeport; but the court ignores that, as well as all other objections, in the sweeping assertion:

"If the settlement of Joseph Olmstead's estate did not by law belong to the court of probate for the district of Bridgeport, but did belong to the court of probate for the district of Woodbury, the action of the court of probate for the district of Bridgeport was utterly void, and all subsequent proceedings, whether by commissioners or otherwise, necessarily void also."

Finally, it by no means appears, as urged by the defendants, that the collateral attack upon the probate proceeding was not made by the party who had invoked the jurisdiction of the court. Even if it were, the answer is contained in the rule, quoted with approval from Wildman v. Rider, 23 Conn. 172, to the effect that "it was the duty of that court to dismiss the case whenever it discovered that it had no jurisdiction over it, and it was immaterial, by whom a knowledge of that fact was communicated." At page 176.

To sum up this analysis, then, the Olmstead Case, as I read it, is authority for these propositions: In probate proceedings, whether ex parte or otherwise, the fact of residence within the district is the fundamental jurisdictional fact, the nonexistence of which may be shown in absolute avoidance of the proceedings at any time by any person in direct or collateral attack, and that no jurisdiction vests in the superior court merely because the parties in the inferior court consented to the exercise of jurisdiction.

I come now to Appeal of Culver,—a case which further answers the objection of the defendants that after the question of domicile has been raised, and evidence has been taken, and the court has judicially determined the question of domicile, the judgment thereon rendered is everywhere proof against collateral attack. Such is the rule in New York, at least "where jurisdiction depends on a fact that is litigated in a suit, and is adjudged in favor of the party who avers jurisdiction." O'Donoghue v. Boies, 159 N. Y. 87, 53 N. E. 537. And so in other jurisdictions. Reinach v. Railroad Co. (C. C.) 58 Fed. 33; Irwin v. Scriber, 18 Cal. 499; Bostwick v. Skinner, 80 Ill. 147; Noble v. Railroad Co., 147 U. S. 165, 13 Sup. Ct. 271, 37 L. Ed. 123. It is unnecessary to consider the nice question what "litigated" in a suit means, as the Culver Case is Connecticut authority for a contrary proposition, so far as the probate court is concerned. In Appeal of Culver one Adye, who had been a settled inhabitant of the town of Seymour, within the probate district of New Haven, where a conservator of his person and property had been appointed, moved into the probate district of Woodbury, with the intention of making that town his permanent home. After Adye's death in Woodbury, the probate court for the district of New Haven appointed the appellant, Culver, administrator, on the basis of continued residence in Seymour under the conservatorship proceedings theretofore had in that district. Thereafter his will was offered for probate in the Woodbury district. Culver objected to the probate, put in evidence proof of his appointment as administrator in New Haven, and claimed that, under that decree, Adye's residence was found to be in Seymour, and that, so long as the

decree stood unreversed, the Woodbury court had no jurisdiction in the premises. The Woodbury court, however, held itself not bound by the prior decree, and, after a full hearing, found that the testator last resided in Woodbury. Its judgment was affirmed both in the superior court and in the supreme court of errors, thus sustaining the clearest sort of collateral attack. There the argument made by the appellant, barring the question of party character, was the same as made here by the defendants. In the opinion in the Culver Case the court summarizes that argument as follows:

"Any court has the power to decide the facts that give itself jurisdiction. Such power is essential to the existence of the court, and a finding of jurisdictional facts by any court is final, unless set aside by some regular proceeding. It cannot be treated as a nullity. The court of probate in New Haven had decided the question of Adye's residence, and the court in Woodbury was bound by that decision so long as it stood. That question was res adjudicata."

The court, having stated the objection, answered it thus:

"This argument entirely ignores a well-settled distinction between judgments of courts of general jurisdiction, which cannot be collaterally attacked, unless the want of jurisdiction is apparent on the record, and judgments of courts of limited and inferior jurisdiction, which can be collaterally attacked; and, if the want of jurisdiction in fact exists, the judgment is an absolute nullity."

This statement of the rule is so unequivocal and so sweeping that it seems to me quite immaterial whether or not the assumption of jurisdiction in the first instance was ex parte or inter partes. Much time was devoted at the trial and on the briefs to showing what was the exact party status on the administration proceedings. In the points prefixed to the court's opinion in Appeal of Culver, it is stated that all the parties were present before the New Haven probate court on the appointment of the administrator. From the original brief, however, used on the argument in Appeal of Culver, and offered in evidence on this trial, it seems more likely that the reference as to the presence of all parties was to the conservatorship proceedings. Be that as it may, the Connecticut rule seems independent of the question of parties. Where there is want of jurisdiction in a probate court, the judgment is an absolute nullity. Residence is not a quasi jurisdictional, but a jurisdictional, fact, and it is quite immaterial who asserted the fact of residence in the first instance. In the case of an inferior court of limited jurisdiction, in contrast to one of general jurisdiction, the court in which the judgment is attacked, either directly or collaterally, looks beyond and behind the consent of parties, to discover whether the jurisdictional prerequisite in fact existed; and, if it did not, the circumstances under which the judgment was rendered are ignored, and it is treated as a nullity. This I take to be the effect of the Connecticut decision. Mr. Justice Loomis, one of the most satisfactory experts examined on the trial before me, who wrote the opinion in the Culver Case, and who, it may be incidentally remarked, concurred in the Olmstead opinion, so interpreted the Connecticut authorities on the stand, and, referring particularly to the Culver Case, asserts that, in the deliberation leading to the decision therein, he and his associates

on the bench were of the opinion that the ex parte or inter partes character of the proceeding involved in the collateral attack was not a material fact, and did ·not control their decision. While I am, of course, aware that expert testimony cannot overcome the actual decisions and statutes, the interpretation of which is a matter of law for the court (Banks v. Morse, 168 N. Y. 458, 61 N. E. 774), this is a case where they are in harmony, and where the testimony clarifies a difficulty suggested by the defendants. In this connection it is instructive to note that in at least one of those few jurisdictions where a rule similar to that of Connecticut is followed the court argumentatively referred to a case where all the parties were before the court. And even after stating that there was much to commend conclusiveness of the decree against collateral attack in such a case, the court laid down a general rule for all cases, regardless of party character, and cited the Culver and Sears Cases in support of its view. The rule is made to turn upon the principle that it is inconceivable how the court can acquire jurisdiction by simply deciding that it has such, when the circumstances which are necessary to give it do not exist. Bank v. Wilcox, 15 R. I. 258, 3 Atl. 211, 2 Am. St. Rep. 894.

· The reason for the Connecticut rule will perhaps be better understood if the course of development of probate courts be briefly referred to. The origin of our probate courts is traced back to the ecclesiastical courts of England, the jurisdiction of which was practically limited to the probate of wills, the granting of administrations, and the suing for legacies. 3 Bl. Comm. pp. 95–98. In every other respect the control of estates, executors, and administrators was exclusively in the common law and chancery courts. As Judge Woerner puts it in his invaluable treatise, "The American Law of Administration":

"It should therefore be remembered that there is a very great difference between the totality of the powers exercised by the English courts in connection with the administration of estates of deceased persons, sometimes called testamentary or probate jurisdiction, and the testamentary or probate jurisdiction of ecclesiastical courts,—a distinction which is of the utmost importance in ascertaining the conclusiveness of the judgments and decrees of the several classes of courts in collateral proceedings."

Now, in this country, probate courts, since their first establishment in Massachusetts in 1784 (Rev. St. 1784, c. 46; Wales v. Willard, 2 Mass. 124), were patterned after the English models. But in the great majority of instances they have outgrown their limited and inferior jurisdiction as mere statutory courts deriving their sole authority from legislative enactment, and have developed into courts of record, with increased powers (proceeding according to the course of common law), and "within the field of their jurisdiction they are as much a branch of the judiciary of the state as any court of general or plenary powers. * * * Their orders, judgments, and decrees are therefore as conclusive upon the parties to the record, until reversed or annulled on appeal, writ of error, or direct proceeding in chancery for fraud, as decrees in chancery or judgments at law." Woerner, Adm'n (2d Ed.) § 145. Connecticut, however, has

remained a signal exception, and there the sounder rule that, where the mistake is one of fact, the record should be collaterally invulnerable, has not found favor in the case of probate courts. In that state they are still committed to a restrictive view of probate jurisdiction. The court is described as of "limited jurisdiction" (Griffin v. Pratt, 3 Conn. 513); as "inferior courts of limited jurisdiction" (Wattles v. Hyde, 9 Conn. 13); as "limited and inferior" (Appeal of Culver, supra); as of "special and limited jurisdiction" (Appeal of Potwine, 31 Conn. 381); as "limited and special and purely statutory" (Fayerweather v. Monson, 61 Conn. 431, 23 Atl. 878); as "not proceeding according to the course of the common law" (Sears v. Terry, supra). While probate courts have almost universally become courts of record, presided over by able and learned judges, it appears from the evidence that many of the numerous probate courts of Connecticut are officered by laymen, and that only in the larger towns are lawyers chosen as judges. The proceedings are relatively informal. On such questions as domicile nothing that can be formally designated a "trial" takes place. A judge may, in the determination of any matter pending before him, call to his assistance a judge of the higher court or another probate judge. Gen. St. Conn. 1888, § 430. There are 112 probate districts in Connecticut, with a judge for each district, so that there are nearly twice as many probate judges in the relatively small state of Connecticut as there are surrogates in the whole state of New York. In view of their slight dignity as courts, it is perhaps not surprising that they are not regarded as tribunals competent to decide whether the facts in any given case confer jurisdiction, and that, unlike other probate courts, which, while limited in the sphere of their jurisdiction, are not inferior, but general, unlimited, and exclusive within that sphere, the probate courts of Connecticut are special, inferior, and limited, without any presumption in favor of their decrees unless the jurisdictional facts appear on the face of the proceedings, and even then their decrees are prima facie evidence, only, subject to collateral attack and disproof.

To return to the Connecticut cases: The rule I have deduced from the four cases examined has not been affected by section 436, embodied in the revision of 1887, subsequent to the date of the decision in Appeal of Culver. That section reads:

"Every order or decree of a court of probate made by a judge who is disqualified shall be valid unless an appeal be taken therefrom, as hereinafter specified, and no order made by a court of probate upon any matter within its jurisdiction shall be attacked collaterally except for fraud, or set aside save by appeal." Gen. St. Conn. 1887, tit. 13, c. 42, § 436.

That this section is but a re-enactment of the previous common law of Connecticut has been affirmatively held in Appeal of Mallory, 62 Conn. 218, 25 Atl. 109. And see Gallup v. Smith, 59 Conn. 354, 361, 22 Atl. 334, 12 L. R. A. 353. What is a "matter within its jurisdiction"? I think the preceding analysis has sufficiently shown that, where the domiciliary fact does not exist, the matter is not within the court's jurisdiction, and that under the rule prevailing in Connecticut it is quite immaterial under what circumstances the court made its

erroneous decision on the question of legal residence. Much of the difference between the plaintiff's and the defendants' construction of the Connecticut cases and statutes will be reconciled when it is remembered that the facts concerning residence, now generally regarded elsewhere as quasi jurisdictional, and consequently collaterally invulnerable, are in Connecticut treated as jurisdictional, purely. Their absence makes the judgment not merely voidable, but absolutely void. Unlike our New York decisions (Hunt v. Hunt, 72 N. Y. 217, 28 Am. Rep. 129; Kinnier v. Kinnier, 45 N. Y. 535, 6 Am. Rep. 132; Bolton v. Schriever, 135 N. Y. 65, 31 N. E. 1001, 18 L. R. A. 242), a matter within the jurisdiction, so far as subject-matter is concerned, requires, in the case of Connecticut probate courts, though not in the case of their courts of general jurisdiction, something more than the "power lawfully conferred to deal with the general subject involved in the action." Hunt v. Hunt, supra. The power to deal with the subject does not exist unless there was actual residence in the probate district. That is a fundamental jurisdictional datum, the inquiry into which cannot be foreclosed by a mistaken decision on the fact. In other words, what in other fora would be merely erroneous application of a general jurisdiction becomes action without jurisdiction.

I have examined all the cases relied on by the defendants, and find none of them in conflict with the construction I have reached. I do not deem it necessary to further lengthen this opinion by distinguishing all the cases cited in one place or other of the very extended briefs. Two principles will serve to demark them from those I have cited: Thus, where decrees have been held collaterally invulnerable, they will be found to have been rendered either in cases where the matters were within the jurisdiction of the probate court, or where they were rendered by courts of something more than special, inferior, and limited jurisdiction. Appeal of Mix, 35 Conn. 121, 95 Am. Dec. 222, where a probate court decree was held conclusive "upon the parties as to all matters within its jurisdiction," may be taken as the type of the first class, into which these and other cases cited by the defendants fall. Judson v. Lake, 3 Day, 318, 326; Lockwood v. Sturdevant, 6 Conn. 373, 388; Holcomb v. Phelps, 16 Conn. 127, 132; Gates v. Treat, 17 Conn. 388; Shelton v. Hadlock, 62 Conn. 149, 25 Atl. 483; Appeal of Terry, 67 Conn. 181, 34 Atl. 1032. Appeal of Willetts, 50 Conn. 330, insistently and chiefly relied on by the defendants, may be taken as the type of the second class. In that case, after an ex parte grant of letters in Connecticut, an application was made in New York to probate the will of the decedent by all the parties; and, after evidence taken, the surrogate decided that the decedent was a domiciled resident of New York at the time of her death. It is to be noted that in this state the surrogate's court is a court of record. In holding the New York decree conclusive, the court, in Appeal of Willetts, pointedly recognizes the distinction underlying the four cases analyzed, and so clearly stated in Appeal of Culver. Certainly, even on the basis of Connecticut authorities, the decree was attack-proof, because "The judgment in New York is that of a court of record, of general

jurisdiction, proceeding according to the course of the common law, —in other words, of a court having full power to investigate and decide facts, and called upon in due course of law so to do." Further, the very right of collateral attack is recognized by disregarding the Connecticut grant of letters, and giving force to the New York probate. A final word may be said in reference to Holcomb v. Phelps, supra, also much relied on by the defendants. This case preceded the series examined, and may be further distinguished on the ground of the superiority of the court of "competent jurisdiction," and because there had been distribution, as a consequence of which the administrator's action was protected. In this case, so far as appears, no distribution has been had. It is also important to observe that no question of title was involved in the Phelps' Case.

Mention should, perhaps, be made, in conclusion, of the case of Penfield v. Savage, 2 Conn. 386, because, in the light of Appeal of Culver, it shows extremes of the law. Although not proved on the trial as one of the authorities of Connecticut, it is well to refer to it, especially in view of a recent supplemental memorandum submitted by the defendants. They refer to language in a concurring opinion to this effect:

"Every court of limited jurisdiction has a right to ascertain the facts requisite for the exercise of its jurisdiction. * * * The truth of the facts found cannot collaterally be the subject of inquiry."

Even were this the law of the case, it would only be necessary to read the quotations herein given from Appeal of Culver, to show how completely the court had reversed itself. But the extract quoted from the opinion of Hosmer, J., whatever may be my own view as to its legal soundness, cannot be treated as more than mere dictum. This decision was rendered in 1818, and was a case in which it was sought to hold a guardian personally liable in an action for debt on account of necessaries furnished the ward. The first opinion in the case—that of the chief judge—places the decision squarely and solely on the ground that the defendant had incurred no liability, whether she was or was not the lawful guardian of the infant. In that view, it became immaterial whether the guardian had or had not been properly appointed in the first instance.

I have been unable to find anything in all the Connecticut authorities I have examined to alter either my construction of Sears v. Terry, Bank v. Balcom, Appeal of Olmstead, and Appeal of Culver, or my conclusion that they are to-day controlling law in the state of Connecticut. Therefore I am of the opinion that the will of Mr. Plant should be established in this jurisdiction as that of a resident of the county and state of New York at the time of his death.

Judgment accordingly.